RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0210p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

BONFIGLIOLI USA, INC.,

　　　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

MIDWEST ENGINEERED COMPONENTS, INC., A
MINNESOTA CORPORATION,

　　　　　　　　　　　　*Defendant-Appellant*.

No. 25-5208

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:23-cv-00014—Danny C. Reeves, District Judge.

Argued: April 29, 2026

Decided and Filed: July 29, 2026

Before: STRANCH, BLOOMEKATZ, and HERMANDORFER, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** D. Clay Taylor, TAYLOR FRICTON, PLLP, Edina, Minnesota, for Appellant. Justin L. Knappick, DRESSMAN BENZINGER LAVELLE, PSC, Covington, Kentucky, for Appellee. **ON BRIEF:** D. Clay Taylor, TAYLOR FRICTON, PLLP, Edina, Minnesota, for Appellant. Justin L. Knappick, Joseph M. Kramer, DRESSMAN BENZINGER LAVELLE, PSC, Covington, Kentucky, for Appellee.

─────────────

## OPINION

─────────────

BLOOMEKATZ, Circuit Judge. The parties to this appeal debate which state's law governs their contract dispute. Bonfiglioli USA, Inc., a Kentucky manufacturer, argues that Kentucky law governs its attempt to terminate its sales representative agreement with Minnesota-

based Midwest Engineered Components, Inc. (MEC).  Bonfiglioli emphasizes that the parties' contract says that Kentucky law will govern, and underscores that it manufactures its products in Kentucky.  MEC instead contends that the Minnesota Termination of Sales Representatives Act (MTSRA) should govern the terms of the contract's termination.  MEC relies on the fact that the MTSRA contains an aggressive anti-waiver provision that purports to void any contract term that nullifies the statute's protections, including the parties' choice of Kentucky law.  The district court concluded that Kentucky law governs the contract termination and that MEC is not entitled to the MTSRA's protections.  We agree.

We further uphold the jury's verdict that MEC fraudulently induced Bonfiglioli to enter the sales representative contract by misrepresenting that it would follow Kentucky law even though—as demonstrated by a smoking-gun email—it always planned to invoke the MTSRA upon termination.  MEC has not demonstrated that the district court's measured evidentiary decisions and jury instructions on the fraud claim constituted an abuse of discretion.  Nor has it demonstrated that the jury's punitive damages award was so excessive as to violate due process.

We thus affirm the district court in full.

## BACKGROUND

I.       **Factual Background**

A.       **The Parties' Contract**

Bonfiglioli, located in Kentucky, manufactures and sells industrial parts for machines, including excavators and wind turbines.  MEC is a sales representative company that serves as a middleman to facilitate sales of industrial parts from manufacturers to purchasers.  Its principal office is in Minnesota, but it also operates throughout Iowa, Illinois, Wisconsin, North Dakota, and South Dakota.  Bonfiglioli engaged MEC to sell its products in those states.

Several provisions of the parties' operative Sales Representative Agreement (SRA) merit attention for the issues in this appeal.  With respect to the duration of the contract, the SRA states that it "shall be automatically renewed" each year on April 1st unless terminated before then.  SRA, R. 54-4, PageID 740.  Regarding termination, the SRA provides that the "Agreement may

be terminated at any time by [Bonfiglioli] at its discretion without notice and without cause." *Id.* at PageID 743. And, in case of a dispute, the SRA has a choice of law clause that selects Kentucky law to govern the "Agreement" and "the rights of the parties." *Id.* at PageID 745.

As Bonfiglioli would later discover, however, an MEC email showed that MEC never intended to fully comply with the SRA's choice of law provision. Ken Lastovich, MEC's then-current president, requested advice on the draft contract from MEC's former owner, Charlie Quarstad. Quarstad's email responded, "Ken, I have briefly reviewed the contract and noticed a few items. Looks pretty clean contract to me," Quarstad Email, R. 54-7, PageID 761, then went on to comment on several provisions of the contract. Critically, the email directly commented on the draft contract's choice of law clause. It first repeated the draft's text—"This agreement is made and enforced by the laws governed by the State of Kentucky"—and then added Quarstad's commentary: "*We know MN laws supersede this. I would not make mention.*" *Id.* (emphasis added). Lastovich, without mentioning anything about "MN laws" to Bonfiglioli, then executed the SRA, including its choice of Kentucky law to resolve the parties' contract disputes.

Quarstad's email implicitly referenced the MTSRA, which sets forth restrictions on when manufacturers may terminate sales representatives. As relevant here, under the MTSRA a manufacturer "may not terminate a sales representative agreement unless" the manufacturer (1) "has good cause," and (2) "give[s] written notice setting forth the reason(s) for the termination at least 90 days in advance." Minn. Stat. Ann. § 325E.37, subd. 2. The MTSRA also has an aggressive "anti-waiver" provision, which purports to void any contract term, including a choice of law provision, that waives the MTSRA's protections. *Id.* § 325E.37, subd. 7. The anti-waiver provision is as follows:

> Subd. 7. **Prohibition of inclusion of certain unfair contract terms in sales representative agreement.**
>
> (a) No manufacturer . . . shall circumvent compliance with this section by including in a sales representative agreement a term or provision, whether express or implied, that includes or purports to include:
>
> > (1) an application or choice of law of any other state;
> >
> > (2) a choice of venue in any other state; or

(3) a waiver of any provision of this section.

(b) Any term or provision described in paragraph (a) is void and unenforceable.

*Id.* The email represents MEC's view that this anti-waiver provision in the MTSRA "supersedes" the contract's choice of law provision.

**B.      Termination**

After several years of business partnership, Bonfiglioli sent MEC a written termination notice. The notice did not explain the grounds for the termination. Although Bonfiglioli was not required to give advance notice under the operative SRA, the notice set a termination date of 60 days out.

Almost three months after receiving the termination letter, MEC responded to Bonfiglioli claiming that "Bonfiglioli ha[d] committed a number of violations of [the MTSRA]." Demand Letter, R. 54-9, PageID 765. Specifically, MEC contended that Bonfiglioli had not satisfied the MTSRA's restriction that sales representatives may be terminated only for good cause. MEC's letter enclosed a draft summons and complaint charging Bonfiglioli with violating the MTSRA, and threatened to file it in court unless Bonfiglioli paid MEC $165,000 within two weeks.

The timing of MEC's letter is noteworthy. Although the MTSRA requires good cause to terminate an ongoing contract, Minn. Stat. Ann. § 325E.37 subd. 2, the statute allows a party to decline to renew a contract without showing good cause as long as the party provides written notice of their intent not to renew at least 90 days before the renewal date, *id.* § 325E.37 subd. 3. Yet, after receiving Bonfiglioli's termination notice, MEC waited until exactly 89 days before the contract's autorenewal on April 1, 2023, before sending its demand letter to Bonfiglioli invoking the MTSRA. Had MEC informed Bonfiglioli of its belief that the MTSRA applied even a few days earlier, Bonfiglioli could have ended the business relationship while complying with the MTSRA by merely informing MEC that it was declining to renew the contract. Instead, MEC left Bonfiglioli no options under the MTSRA but to satisfy the Act's stringent good cause termination requirements, *id.* § 325E.37 subd. 1–2, or remain in the contract for another year.

Bonfiglioli declined to comply with MEC's demand of $165,000 for the alleged MTSRA violation. Instead, it believed that per the terms of the SRA it could terminate MEC at any time and that MEC had lied when it agreed to be bound by Kentucky law. Rather than capitulate to MEC's six-figure demand, Bonfiglioli brought this lawsuit in the U.S. District Court for the Eastern District of Kentucky.

## II.       Procedural History

Bonfiglioli's lawsuit was both defensive and offensive. Preempting MEC's suit, Bonfiglioli sought declaratory judgments that Kentucky law—not the MTSRA—governed the terms of the contract's termination and that it had properly terminated the SRA. Next, Bonfiglioli asserted claims of fraudulent inducement and fraud by omission, requesting a jury trial and damages for MEC's misrepresenting in the SRA that it agreed to be bound by Kentucky law.

The district court resolved several key issues before trial. The district court determined that Kentucky law governed and thus the MTSRA was inapplicable. Applying Kentucky law, the district court then granted Bonfiglioli declaratory judgment that it had complied with the SRA and had legally terminated MEC. And the district court denied MEC summary judgment on Bonfiglioli's fraudulent inducement claim, concluding that a reasonable jury could find that MEC "misrepresented its intent to be bound by the terms of the SRA." D. Ct. Op. on MSJ, R. 68, PageID 1224 (emphasis omitted). Yet the district court's rulings were not all one-sided: It granted MEC summary judgment on Bonfiglioli's fraud by omission claim. It reasoned that, as a matter of law, MEC had no duty to disclose its belief that the MTSRA applied—a required element of the omission claim.

At trial on the fraudulent inducement claim, Bonfiglioli introduced evidence that MEC misrepresented its intent to comply with the choice of law provision when MEC signed the SRA and that it would not have signed the SRA but for that misrepresentation. It used testimony from the CEOs of MEC and Bonfiglioli, as well as the Quarstad email, to prove these points. Then, Bonfiglioli asked the jury to award significant punitive damages to punish MEC for engaging in reprehensible conduct. It argued that the timing of MEC's demand letter showed MEC was

demanding a ransom. Bonfiglioli adduced testimony that MEC had demanded $165,000 because it believed that sum would force Bonfiglioli into settling as it would be even more costly for Bonfiglioli to defend itself through litigation.

In defense, MEC primarily argued at trial that Bonfiglioli had failed to perform basic investigation into Minnesota's regulatory framework for sales representatives. MEC maintained it had done nothing wrong because Bonfiglioli could have easily discovered the MTSRA on its own. MEC's strategy was, in part, to emphasize that it had no legal duty to inform Bonfiglioli of its belief that the MTSRA superseded the SRA. The district court permitted MEC to argue its lack of a legal duty to disclose in its opening and closing statements. But, citing concerns about juror confusion, the court prevented MEC from presenting testimony demonstrating that it had no duty to disclose the MTSRA and refused to instruct the jury that there was no such duty.

After weighing the evidence, the jury found MEC liable for fraudulent inducement and awarded $1 in nominal damages and $280,000 in punitive damages.

Following the trial, MEC challenged the verdict on several grounds. It moved for judgment as a matter of law, contending Bonfiglioli's failure to independently discover the MTSRA rendered Bonfiglioli's reliance on MEC's misrepresentation categorically unreasonable. MEC further challenged the district court's jury instructions and evidentiary rulings. Finally, MEC requested remittitur or vacatur of the punitive damages award on the grounds that it violated the Fourteenth Amendment's Due Process Clause. The district court denied each of MEC's post-trial motions. MEC timely appealed.

## ANALYSIS

MEC contends that the district court erred in three ways. *First*, it argues that the district court erred by determining that Kentucky law, rather than Minnesota law, governs this dispute. *Second*, MEC challenges the jury verdict on fraudulent inducement, claiming that Bonfiglioli's reliance on the SRA's choice of law provision was not reasonable and that the district court abused its discretion in its evidentiary rulings and jury instructions. *Third*, MEC contends that the $280,000 punitive damages award is unconstitutional. We affirm the district court's ruling on each claim.

## I.      Choice of Law

We review the district court's choice of law analysis de novo.  *Newberry v. Silverman*, 789 F.3d 636, 643 (6th Cir. 2015).  This case arises under diversity jurisdiction, so we apply the choice of law rules of the forum state: here, Kentucky.  *See Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  In other words, we apply Kentucky choice of law rules to determine whether Kentucky or Minnesota substantive law governs this dispute.  *See Uhl*, 512 F.3d at 302.  The MTSRA applies only if Kentucky choice of law rules instruct that it does.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

### A.      Kentucky Choice of Law Rules

It is well established that Kentucky uses § 188 of the Second Restatement of Conflicts to analyze choice of law questions arising from contract disputes.  *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).  Section 188 instructs that the law of the state with the "most significant relationship to the transaction and the parties" governs.  *Id.*; Restatement (Second) of Conflict of Laws § 188(1) (Am. L. Inst. 1971) [hereinafter Restatement of Conflicts].  It provides many factors to determine which state has the most significant relationship, which we analyze in detail shortly.  We further note that Kentucky choice of law rules have "an extremely strong and highly unusual preference" for applying Kentucky law to contract disputes "even in situations where most states would decline to apply their own laws."  *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017).  For example, Kentucky courts have applied Kentucky law even when the parties agreed in their contract for another state's law to apply.  *Breeding v. Mass. Indem. & Life Ins. Co.*, 633 S.W.2d 717, 719–20 (Ky. 1982); *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 566–67 (Ky. 2012).  Although MEC points out that we have previously described Kentucky's choice of law rules as "egocentric" and "provincial," *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000) (citation omitted), as the law of the forum state we

are bound to apply Kentucky choice of law rules notwithstanding their preference for Kentucky law.[1]

Before applying the § 188 framework to the choice of law dispute here, we pause to consider MEC's two objections to deploying that framework. We consider each in turn, but neither persuades.

*First*, MEC argues that the MTSRA's anti-waiver provision preempts standard Kentucky choice of law rules such that we should apply the MTSRA without even performing a choice of law analysis. But MEC's argument contravenes basic choice of law principles. Every conflicts of law analysis necessarily entails multiple states that have an interest in applying their own law. *See* Peter Hay et al., Conflict of Laws, 144 § 3.2 (5th ed. 2010). Thus, a key aim of choice of law doctrine is to provide a predictable, reasoned, and mutually beneficial way to resolve conflicts between different states' interests. *See* Restatement of Conflicts § 188 cmt. b; *id.* § 6 cmt. d. Yet MEC's suggestion that anti-waiver provisions have automatic preemption power would allow states to simply declare that their interests always win out over other states' interests. That could lead to an anti-waiver arms race that would trample interstate comity and the aims of measured choice of law doctrine. For instance, Minnesota has already enacted anti-waiver provisions in legislation governing other types of contracts. Minn. Stat. Ann. § 80C.21 (franchise agreements); *id.* § 80F.18 (agreements marketing motor vehicle fuel); *id.* § 325E.064 (farm equipment dealership agreements); *id.* § 325E.0683 (heavy equipment dealership agreements). Minnesota cannot announce that its law in all these areas always governs multistate agreements and abrogate a standard choice of law analysis, under which we apply the choice of law rules of the forum state. Allowing Minnesota to do so would undermine the aims of choice of law doctrine. *See* Restatement of Conflicts § 188 cmt. b; *id.* § 6 cmt. d.

What these fundamental principles indicate, our precedent confirms. Consider *Tele-Save Merchandising Co. v. Consumers Distributing Co.*, where we addressed the conflict between the parties' agreement, under which New Jersey law would govern their contract disputes, and an

---

[1]Kentucky's choice of law rules are, of course, subject to constitutional limits, *see Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981), but those limits are not at issue in this case.

Ohio statute that contained an anti-waiver provision akin to the MTSRA's. 814 F.2d 1120, 1122–23 (6th Cir. 1987) (quoting Ohio Rev. Code § 1334.15 (1979)). Notwithstanding the anti-waiver provision, *Tele-Save* deployed a standard Ohio choice of law analysis before concluding that the New Jersey selection clause governed. *Id.* at 1122–24. Under *Tele-Save*'s approach, the MTSRA's anti-waiver provision does not automatically win out here. *See id.*; *see also Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 607–08 (4th Cir. 2004); *Takeya USA Corp. v. PowerPlay Mktg. Grp., LLC*, No. 21-cv-835, 2022 WL 17357781, at *6–8 (C.D. Cal. Sep. 1, 2022). Therefore, rather than preempting Kentucky's choice of law analysis, the MTSRA's anti-waiver provision has only as much weight as § 188 gives it.

As its *second* objection to applying § 188 here, MEC contends that we should instead look to § 187 of the Restatement of Conflicts. Section 187 concerns contracts with explicit choice of law provisions and puts a thumb on the scale in favor of the contractual choice of law. In relevant part, it instructs that the parties' choice of Kentucky law controls unless all of the following requirements are met: (1) Kentucky law "would be contrary to" Minnesota's "fundamental policy"; (2) Minnesota "has a materially greater interest" in the dispute than Kentucky; and (3) Minnesota has the most significant relationship to the dispute under § 188. Restatement of Conflicts § 187(2)(b); *see also Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 715–16 (6th Cir. 2015). Given that § 187 typically applies when the parties include a choice of law provision in their contract, we understand MEC's suggestion that it should apply here. We need not spend much time considering MEC's argument, however, because it runs headlong into our precedent holding that Kentucky courts use only § 188 in a choice of law analysis, not § 187. *Osborn*, 865 F.3d at 444. And, even if precedent did not bar MEC's argument, we ultimately conclude below that Kentucky has the "most significant relationship" to the dispute under § 188. So MEC would fail the third requirement of the § 187 test even if that section applied. Accordingly, we find MEC's objections to a § 188 analysis unpersuasive.

**B.      Most Significant Relationship**

Turning to the § 188 analysis, the central question we must answer is which state has the "most significant relationship" to "the transaction and the parties." Restatement of Conflicts

§ 188(1). For this inquiry, the Restatement provides myriad factors for us to weigh. Section 188 directs us to consider the "place[] of negotiating and contracting; the place of performance; the location of the contract's subject matter; and the domicile, residence, place of incorporation and place of business of the parties." *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878–79 (Ky. 2013) (citing Restatement of Conflicts § 188(2)). Then, § 188 also incorporates § 6, which further instructs us to consider: "(a) the needs of the interstate . . . system[], (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement of Conflicts § 6(2).

Kentucky courts do not appear to distinguish between the factors enumerated in § 188 and § 6 when performing a "most significant relationship" analysis. *See, e.g.*, *Grange Prop. & Cas. Co. v. Tenn. Farmers Mut. Ins. Co.*, 445 S.W.3d 51, 55 (Ky. Ct. App. 2014). As such, we analyze the factors in § 188 and § 6 together. We first examine several key factors that counsel applying Kentucky law. We then turn to the factors that MEC relies on, and determine that they do not outweigh the factors favoring Kentucky law. Finally, we discuss the remaining factors, which carry little weight on these facts. We ultimately conclude that Kentucky has the most significant relationship to this dispute.

*Factors Favoring Kentucky.* First, the subject matter of the contract is coordinating sales of Bonfiglioli's products. *See* Restatement of Conflicts § 188(2)(d). Given that the products were produced in Kentucky and shipped from Kentucky, every sale was governed by Kentucky law, and every commission to MEC was paid from Kentucky, this factor favors Kentucky. MEC rejoins that the focus of the subject-matter inquiry is MEC's sales coordination, not Bonfiglioli's products. Framed that way, MEC suggests, the SRA's subject matter favors applying Minnesota law. However, the record evidence shows that MEC's sales coordination was diffuse and not only centered in Minnesota. The vast majority of the sales that MEC arranged were in Wisconsin and Illinois, while less than 16% were in Minnesota. Half of MEC's work coordinating sales took place on the road throughout its territory. The remaining work was split

between MEC's Minnesota office and remote workers located in Wisconsin. Therefore, even focusing on the subject matter of the SRA as MEC's sales coordination, MEC's activity was so diffuse as to not provide a strong justification to apply Minnesota law, and is outweighed by the fact that each and every sale had a connection to Kentucky.

Next, applying Kentucky law would promote the justified expectation of the parties. *See* Restatement of Conflicts § 6(2)(d). The parties negotiated the SRA and Bonfiglioli testified that it would not have signed the SRA without the choice of law provision, showing that the choice of law provision was an important piece of the contract. Voiding the choice of law provision and applying Minnesota law would thus give MEC "more than it bargained for." *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 362 n.2 (6th Cir. 1993). It was reasonable for Bonfiglioli to expect that Kentucky law would apply, since MEC never shared its belief that the MTSRA would supersede the choice of law provision. So even though the choice of law provision is not an automatic trump card under § 188, it weighs in favor of applying Kentucky law.

Applying Kentucky law also promotes the "needs of the interstate . . . system," "certainty, predictability, and uniformity," and "ease in the determination" of "the law to be applied." Restatement of Conflicts § 6(2)(a), (f), (g). Here, because the SRA covers many states, honoring the parties' choice of law provision facilitates interstate commerce, minimizes potential for unexpected liability, and provides a straightforward way to resolve the choice of law issue.

*MEC's Cited Factors.* Attempting to rebut the above factors, MEC focuses on the "relevant policies" and "interests" of the involved states. *See id.* § 6(2)(b)–(c). It champions the MTSRA's anti-waiver provision as evidence of Minnesota's strong policy interest in protecting sales representatives. Kentucky also has a policy interest in this dispute, however, so Minnesota's interest does not necessarily carry the day. Indeed, Kentucky courts have repeatedly expressed the importance of freedom of contract and the ability to rely on contractual negotiations. *See, e.g.*, *Zeitz v. Foley*, 264 S.W.2d 267, 268 (Ky. 1954); *United Servs. Auto. Ass'n v. ADT Sec. Servs., Inc.*, 241 S.W.3d 335, 342 (Ky. Ct. App. 2006). MEC counters that

statutory pronouncements of state interest outweigh those from common law.  But even if that is true as a general matter, "not every statutory provision constitutes a [state's] fundamental policy," *Volvo Constr.*, 386 F.3d at 607, and Minnesota has enacted multiple analogous anti-waiver provisions, *see* Minn. Stat. Ann. § 80C.21; *id.* § 80F.18; *id.* § 325E.064; *id.* § 325E.0683. So the MTSRA's anti-waiver provision does not appear to be a "limited and targeted departure from [Minnesota's] normal policies," which undercuts MEC's argument that Minnesota's interest greatly outweighs Kentucky's.  *Lakeside Surfaces, Inc. v. Cambria Co.*, 16 F.4th 209, 220 (6th Cir. 2021).

MEC further emphasizes that Minnesota must be able to enforce the MTSRA's anti-waiver provision in order to protect the economic interests of workers within its borders.  While that argument may be more salient in other cases, it is less so on these facts, where MEC's performance was spread between several states.  In short, absent a compelling reason to consider the MTSRA's policy interest stronger than Kentucky's, the states' policy interests largely break even.  *See Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383, 391 (6th Cir. 2017).  Even assuming the MTSRA's anti-waiver provision weighs somewhat in favor of applying Minnesota law, it does not overcome the factors favoring Kentucky.

MEC next argues that the place of performance favors applying Minnesota law.  *See* Restatement of Conflicts § 188(2)(c).  But when a contract hires a sales representative to cover a multistate area, the place of performance generally carries little weight in a § 188 analysis.  *See id.* § 196 cmt. a; *see also Monsanto Co. v. Manning*, 841 F.2d 1126, at *3 (6th Cir. 1988) (table). Moreover, that MEC's performance took place across several states undermines its argument that the place of performance requires us to apply Minnesota law.

*Remaining Factors.*  The remaining factors do not favor either party.  The record evidence does not establish that either Kentucky or Minnesota "served as the primary forum for negotiating and entering into the SRA."  D. Ct. Op. on MSJ, R. 68, PageID 1214; *see* Restatement of Conflicts § 188(2)(a)–(b).  And the residence of the parties is a wash, as Bonfiglioli's principal place of business is Kentucky while MEC is headquartered in Minnesota. *See* Restatement of Conflicts § 188(2)(e).

Overall, considering the factors in § 188 and § 6, we conclude that Kentucky has the most significant relationship to this dispute. The MTSRA's anti-waiver provision cannot overcome the bulk of the § 188 and § 6 factors favoring Kentucky.

Other cases performing § 188 analyses bolster this conclusion. For example, *Johnson v. Ventra Group, Inc.* concerned an Ontario corporation's sales representative contract with a Michigan-based sales representative. 191 F.3d 732, 736–38 (6th Cir. 1999). Even though all the sales were coordinated outside of Ontario, we concluded that Ontario had the most significant relationship to the dispute, in part because the parties had a justified expectation that Ontario law would apply based on a choice of law provision in their contract. *Id.* at 736, 741–42. District courts in our circuit have reached similar determinations. *See, e.g.*, *Q Holding Co. v. Repco, Inc.*, No. 17-cv-445, 2017 WL 2787576, at \*3–4 (N.D. Ohio June 28, 2017); *Wallace Sales & Consulting, LLC v. Tuopu N. Am., Ltd.*, No. 15-cv-10748, 2016 WL 1436585, at \*5–6 (E.D. Mich. Apr. 12, 2016). Although MEC cites District of Minnesota cases that applied the MTSRA to interstate disputes, those cases either did not perform a choice of law analysis, *e.g.*, *Apex Tech. Sales, Inc. v. Leviton Mfg., Inc.*, No. 17-cv-2019, 2017 WL 2731312, at \*4 (D. Minn. June 26, 2017), or performed a Minnesota choice of law analysis, *e.g.*, *Hedding v. Pneu Fast Co.*, No. 18-cv-1233, 2019 WL 79006, at \*3–4 (D. Minn. Jan. 2, 2019), which does not govern here.

In sum, we conclude that Kentucky law governs this dispute, the MTSRA is inapplicable, and thus Bonfiglioli legally terminated the SRA.

## II.     Fraudulent Inducement Liability

We now examine MEC's objections to its liability for fraudulent inducement. MEC raises two arguments. *First*, MEC contends it was entitled to judgment as a matter of law because Bonfiglioli should have discovered the MTSRA on its own and, therefore, it was unreasonable for Bonfiglioli to rely on MEC's representation that it would be bound by Kentucky law. *Second*, MEC says the district court abused its discretion by preventing it from presenting evidence and instructing the jury that it had no duty to share its belief that the MTSRA applied. We find neither argument convincing.

A.      **Reasonable Reliance**

To prevail on the fraudulent inducement claim, Bonfiglioli needed to prove it "reasonably relied" on MEC's misrepresentation that MEC intended to be bound by the SRA's choice of law provision. *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 45–46 (Ky. 2018). Under Kentucky law, Bonfiglioli's reliance was reasonable if (1) Bonfiglioli had "reason to believe" MEC's misrepresentation; and (2) MEC's misrepresentation was "material," i.e., important to Bonfiglioli's decision to sign the SRA. Restatement (Second) of Torts §§ 538, 544 (Am. L. Inst. 1976) [hereinafter Restatement of Torts]; *see also PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 613–15 (Ky. Ct. App. 2011) (citing the Restatement as governing law on fraudulent inducement); *Yung*, 563 S.W.3d at 45–46 (same). Whether Bonfiglioli's reliance was reasonable is a "question of fact" that was presumptively reserved for the jury. *Yung*, 563 S.W.3d at 47; *see also PCR Contractors*, 354 S.W.3d at 616. We will not reverse the jury's finding unless we conclude there was "no room for a reasonable difference of opinion." *Yung*, 563 S.W.3d at 47 (quoting *McColgan v. Mut. of Omaha Ins. Co.*, 4 F. Supp. 3d 1228, 1233 (E.D. Cal. 2014)).

MEC was not entitled to judgment as a matter of law on the reasonable reliance issue. As to the first element, MEC admitted at trial that "by signing [the SRA]," it "represented to Bonfiglioli it intended to comply with [the SRA's] terms." Trial Tr. I, R. 107, PageID 1757. Kentucky law considers the fact that MEC signed the SRA sufficient reason to believe that MEC would carry out its promise. *See PCR Contractors*, 354 S.W.3d at 613–15; *see also Major v. Christian Cnty. Livestock Mkt., Inc.*, 300 S.W.2d 246, 249 (Ky. 1957). Indeed, MEC's signing the contract was an "assertion of an intention to perform it." Restatement of Torts § 530 cmt. c. And as to the second element, Bonfiglioli's CEO testified that he would not have signed the SRA but for MEC's misrepresentation of its intent to be bound by Kentucky law. That fact shows MEC's misrepresentation was material. *See id.* § 538. Thus, the jury was not foreclosed from finding reasonable reliance. *See Yung*, 563 S.W.3d at 47.

MEC objects to that conclusion. It argues that because Bonfiglioli did not investigate Minnesota's regulatory scheme and independently discover the existence of the MTSRA, no reasonable jury could find that its reliance was reasonable. But, as explained, a reasonable jury

could find that Bonfiglioli did not need to take further action beyond securing its rights under a contract because signing a contract is an objective manifestation of intent to abide by its terms. *See* Restatement of Torts § 530 cmt. c; *Furtula v. Univ. of Ky.*, 438 S.W.3d 303, 308–09 (Ky. 2014); *cf. Burke v. Burke*, No. 2021-CA-0073, 2021 WL 5141760, at *2 (Ky. Ct. App. Nov. 5, 2021) (signing a contract "evinc[es] [one's] intent to be bound by the instrument"). Nor could Bonfiglioli have discovered that MEC did not intend to abide by the SRA through "ordinary vigilance." *Yung*, 563 S.W.3d at 46. Even if Bonfiglioli had discovered the MTSRA, it would not have necessarily known that MEC would sign the SRA without intending to follow the SRA's choice of Kentucky law.

The cases MEC relies on did not preclude the jury from finding reasonable reliance. MEC cites *Flegles, Inc. v. TruServ Corp.* for the proposition that "recipients of business representations" have "a duty to exercise common sense." 289 S.W.3d 544, 549 (Ky. 2009). But *Flegles* invoked the idea of common sense to explain why "forward-looking opinions about investment prospects or future sales performance" are generally not actionable in a fraudulent inducement claim. *Id.* That principle does not apply to this case, as MEC did not misrepresent its "projections about future events," *id.* at 550, but rather its then-present intent to be bound by the SRA, *see Christian Cnty. Livestock Mkt.*, 300 S.W.2d at 249; Restatement of Torts § 530 cmt. c. Similarly unavailing is *Stansbury v. Hopkins Hardwoods, Inc.*, where the plaintiff declined to take any steps to investigate the defendant's appraisal even though the appraisal's accuracy was suspicious on its face and conflicted with a prior appraisal. 769 F. App'x 202, 205–06 (6th Cir. 2019). Here, MEC points to no record evidence showing that its representation that it intended to abide by the SRA it negotiated and signed was suspicious on its face.

Overall, the district court properly concluded that MEC was not entitled to judgment as a matter of law on Bonfiglioli's fraudulent inducement claim.

### B.      Lack of a Duty to Disclose

MEC's second challenge to its fraudulent inducement liability contends that the district court erred by limiting MEC's presentation of testimony and by refusing to give MEC's requested jury instruction regarding its lack of a duty to inform Bonfiglioli about the MTSRA.

We begin our discussion of these issues with some background. Recall that Bonfiglioli initially brought a fraud by omission claim in addition to the fraudulent inducement claim. While they have some similarities, the two claims are distinct. As discussed above, a fraudulent inducement claim turns on a misrepresentation of present intent. *See Yung*, 563 S.W.3d at 46. By contrast, the fraud by omission claim centers around a failure to disclose a material fact. *See id.* at 45 n.27. A required element of the omission claim was that MEC "had a duty to disclose" its belief that the MTSRA applied. *Id.* (quoting *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011)). However, the district court concluded as a matter of law that MEC had no such legal duty and thus granted MEC summary judgment on the omission claim.

At trial on the fraudulent inducement claim, MEC emphasized its lack of a legal duty to disclose. The district court permitted MEC to argue this point in its opening and closing statements, but prevented MEC from adducing testimony on the topic. And the district court declined to instruct the jury that MEC had no duty to disclose its belief that the MTSRA applied. MEC maintains the district court erred by barring testimony on its lack of a duty to disclose, as well as by refusing to give its requested jury instruction. Reviewing the district court's rulings on both issues for an abuse of discretion, *United States v. Cox*, 871 F.3d 479, 486 (6th Cir. 2017) (evidentiary rulings); *Cole v. City of Memphis*, 839 F.3d 530, 538 (6th Cir. 2016) (jury instructions), we reject MEC's arguments.

Start with the district court's evidentiary rulings. The district court was permitted to "exclude relevant evidence if its probative value is substantially outweighed" by a risk of "confusing the issues" or "misleading the jury." Fed. R. Evid. 403. The district court reasonably determined that MEC's desired testimony had very minimal probative value yet risked misleading the jury. As noted, the lack of a duty to disclose information is distinct from falsely misrepresenting one's present intent. Although MEC's failure to share its belief that the MTSRA preempted the SRA's choice of law provision is circumstantial evidence of its intent not to comply with the SRA, the jury could not have found MEC liable for fraudulent inducement merely based on MEC's failure to disclose. *See Yung*, 563 S.W.3d at 45–46. Thus, whether MEC had a duty to disclose had minimal relevance, if any, to the fraudulent inducement claim. Indeed, the lack of a duty to disclose does little to negate the circumstantial evidence that MEC

did not intend to comply with the SRA. However, MEC's desired evidence presented a risk of implying that MEC did nothing wrong by signing a contract it did not intend to abide by. Accordingly, the district court did not abuse its discretion when rejecting MEC's attempt to introduce such evidence.

A similar analysis applies to the jury instructions. We examine whether the instructions "adequately inform[ed] the jury of the relevant considerations and provide[d] the jury with a sound basis in law with which to reach a conclusion." *Cole*, 839 F.3d at 538 (quoting *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1074 (6th Cir. 2015)). We reverse for an error in jury instructions only when "the instructions, considered as a whole, are confusing, misleading, or prejudicial." *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000) (quoting *Davis v. Mut. Life Ins. Co.*, 6 F.3d 367, 373 (6th Cir. 1993)). Here, an instruction that MEC had no duty to disclose its belief that the MTSRA applied was unnecessary. As explained, the fraud by omission claim was already dismissed and the existence of a duty to disclose did not control whether MEC was liable for fraudulent inducement. Yet the instruction posed a risk of confusing the jury. Thus, the district court did not abuse its discretion by declining to issue it.

MEC's arguments to the contrary on both the evidentiary issues and jury instructions are unpersuasive. MEC suggests that Bonfiglioli "transform[ed] its fraudulent inducement claim into fraud by omission through the back door" such that MEC needed to discuss the lack of a duty to disclose. Appellant Br. at 45. But MEC's argument continues to rest on its mistaken belief that the jury found it liable for "signing an SRA it knew contained possibly void terms" yet "remaining *silent*." Reply Br. at 9. Instead, the jury instructions on fraudulent inducement properly required the jury to find that MEC made a "false" "misrepresentation," not just stayed silent. Jury Instructions, R. 94, PageID 1458. We presume that juries "follow the instructions they are given," *United States v. McNoriell*, 176 F.4th 413, 427 (6th Cir. 2026) (quoting *United States v. Davis*, 306 F.3d 398, 416 (6th Cir. 2002)), so here the jury could not have found MEC liable simply for its nondisclosure.

Finally, MEC points to one juror's handwritten note on the jury instructions stating "email witholding [sic] MN law info" next to the element requiring that MEC's representation

was false.  Jury Instructions, R. 94, PageID 1458.  MEC argues this notation proves the jury found MEC liable for not disclosing its belief that the MTSRA applied.  Yet the notation's import is far from clear.  For example, it could easily have been referencing the Quarstad email as evidence that MEC never intended to comply with the choice of law provision, thus showing that MEC's representation when signing the SRA was false.  Therefore, the handwritten note reveals no deficiency in the jury instructions.

In sum, MEC has not shown that the district court abused its discretion in either its jury instructions or evidentiary rulings.

## III.     Punitive Damages

We lastly consider MEC's challenge to the jury's award of $280,000 in punitive damages.  Some overview on punitive damages is a helpful starting point.  Punitive damages serve the twin aims of punishment and deterrence.  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001).  In this diversity case, Kentucky law governs their award.  *See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989); *see also* Ky. Rev. Stat. § 411.184, .186.  States have "considerable flexibility" in deciding when and how much punitive damages are permissible.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996).  Yet the states' prerogative over punitive damages is not without limit.  The substantive component of the Fourteenth Amendment's Due Process Clause has been interpreted to prohibit punitive damages that are "grossly excessive."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

Whether the punitive damages award is grossly excessive turns on whether MEC had "fair notice" that the award was possible.  *Id.* at 417 (quoting *Gore*, 517 U.S. at 574).  Three guideposts inform that question: (1) the "degree of reprehensibility" of MEC's conduct; (2) the "ratio" "between the actual or potential harm" and the punitive damages award; and (3) a comparison to comparable awards and penalties.  *Id.* at 418, 424 (citing *Gore*, 517 U.S. at 575); *see also Wesley v. Campbell*, 864 F.3d 433, 443 (6th Cir. 2017).  Conducting de novo review, *Campbell*, 538 U.S. at 418, we affirm the punitive damages award.

A.      **Reprehensibility**

The degree of reprehensibility is the "most important" guidepost in the grossly excessive analysis. *Id.* at 419 (quoting *Gore*, 517 U.S. at 575). The factors relevant to the degree of reprehensibility include whether: the harm was physical or economic; the conduct was indifferent to or recklessly disregarded health or safety; the victim was financially vulnerable; the conduct was repeated versus one-off; and "the harm was the result of intentional malice, trickery, or deceit," as opposed to a "mere accident." *Id.* While the absence of all these factors "renders an award suspect," a significant punitive damages award may be warranted even if only some of them are present. *Wesley*, 864 F.3d at 444–45. We further note that action taken "in order to augment profit represents an enhanced degree of punishable culpability." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 494 (2008). The reprehensibility inquiry examines "all the circumstances" of MEC's conduct, "not merely the [tortious] act itself." *Id.* (quoting Restatement of Torts § 908 cmt. e); *see also Yung*, 563 S.W.3d at 45 n.27.

MEC's conduct was sufficiently reprehensible to permit a punitive damages award of $280,000. Far from a "mere accident," *Campbell*, 538 U.S. at 419, the record and jury verdict show that MEC intentionally made a false, material representation regarding its intent to be bound by the SRA's choice of law provision. Indeed, the Quarstad email is evidence that MEC never intended to comply with the SRA's choice of Kentucky law. That type of intentional "trickery[] or deceit" constitutes reprehensible conduct. *Id.*

Crucially, the way MEC handled its demand letter compounds the reprehensibility of MEC's conduct. Recall that MEC waited until one day after the point Bonfiglioli could have declined to renew the contract without having to satisfy the MTSRA's stringent good cause requirements for a termination. *See* Minn. Stat. Ann. § 325E.37 subd. 1(b), 2(a), 3. Then MEC asserted that Bonfiglioli had violated the MTSRA and demanded $165,000 because it believed that, staring down the cost of litigation, Bonfiglioli would have no rational choice but to pay up. In other words, rather than being a good faith attempt to assert its rights under the MTSRA, MEC attempted to profit off its fraudulent inducement by shaking down Bonfiglioli. That conduct significantly raises the degree of reprehensibility beyond merely committing the

fraudulent inducement in the first place. *See Exxon Shipping*, 554 U.S. at 494. And though MEC argues that its response to Bonfiglioli's termination attempt was handled by new leadership that did not know about the Quarstad email, even assuming that is true does not absolve MEC of responsibility. For one thing, Bonfiglioli sued MEC itself, and we impute MEC's agents' knowledge to the company. *See* Restatement (Second) of Agency § 272 (Am. L. Inst. 1958). Furthermore, the issue is not whether MEC's leadership knew about the Quarstad email specifically, but rather the fact that MEC attempted to profit off its fraudulent inducement. Overall, the totality of MEC's conduct supports the punitive damages award.

MEC disagrees with this reprehensibility analysis. Relying on *Gore* and *Campbell*, MEC argues that the award is impermissible because Kentucky "may not impose economic sanctions . . . with the intent of changing [MEC's] lawful conduct in other States." *Gore*, 517 U.S. at 572; *see also Campbell*, 538 U.S. at 419–20. But MEC attacks a strawman. On this record, there is no evidence that the punitive damages award is attempting to do that. While Bonfiglioli argued that a punitive damages award should provide deterrence, it never asked the jury to impose an award to change MEC's practice in other states. By contrast, the problematic arguments to the jury in *Gore* and *Campbell* condemned the tortfeasor "for its nationwide policies rather than for the conduct directed toward" the plaintiff. *Campbell*, 538 U.S. at 420; *see also Gore*, 517 U.S. at 572.

MEC's remaining arguments on reprehensibility boil down to the fact that several of the reprehensibility factors are not present in this case. For instance, MEC points out that the harm was economic, not physical, and that Bonfiglioli did not claim at trial to be financially vulnerable. Yet these arguments fail because not all factors must be present to merit a significant punitive damages award. *See Campbell*, 538 U.S. at 419. Indeed, we have previously explained that punitive damages may be appropriate even when only one reprehensibility factor is met. *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 487–88 (6th Cir. 2007).

## B. Ratio

The next guidepost is the ratio between the "actual or potential harm" and the amount of punitive damages. *Campbell*, 538 U.S. at 418. Here, the potential harm from MEC's fraudulent

inducement was the $165,000 that MEC demanded as a "settlement" payment. Demand Letter, R. 54-9, PageID 767. Comparing that figure with the $280,000 in punitive damages creates a ratio of 1.7-to-1, well within the single-digit multipliers that typically comport with due process. *See, e.g.*, *Wesley*, 864 F.3d at 445; *Campbell*, 538 U.S. at 425. Moreover, the fact that Bonfiglioli had "low incentive[] to sue" MEC for fraud absent a potential award of punitive damages further justifies the award. *See Exxon Shipping*, 554 U.S. at 494.

MEC maintains that the award is grossly excessive when viewed in comparison to the jury's award of only one dollar in nominal damages. But, as noted, *Gore* expressly contemplated that the ratio inquiry encompasses "potential harm" from the defendant's conduct, not just actual harm. 517 U.S. at 575, 582; *see also Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 661 (E.D. Ky. 2009) (Thapar, J.) ("[P]otential harm and potential damages can be taken into account when calculating the damages ratio."). Furthermore, the mathematical ratio inquiry does not apply to a comparison between punitive damages and nominal damages. For example, in *Romanski v. Detroit Entertainment, L.L.C.*, we affirmed a $600,000 punitive damages award (or $985,000 when adjusted for inflation) notwithstanding the fact that the jury's award of $279 in compensatory damages was "so minimal as to be essentially nominal." 428 F.3d 629, 645, 649 (6th Cir. 2005). We explained that "in cases where the compensatory award is very low or nominal, '*any* appreciable exemplary award would produce a ratio that would appear excessive.'" *Id.* at 646 (quoting *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996)); *see also Arnold v. Wilder*, 657 F.3d 353, 370 (6th Cir. 2011); *Jester v. Hutt*, 937 F.3d 233, 242 (3d Cir. 2019) (collecting cases in other circuits). Here, then, the jury's award of only nominal compensatory damages does not preclude the $280,000 punitive damages award.

C.      **Comparable Awards**

The final guidepost examines whether statutory law and previous cases provided "fair notice" to MEC that its fraudulent inducement "might result in penalties, fines, or punitive damages" in the amount awarded here. *Romanski*, 428 F.3d at 648; *see also Kidis v. Reid*, 976 F.3d 708, 717 (6th Cir. 2020).

Statutory law weighs in favor of affirming the award. Kentucky has no statutory cap or maximum ratio for punitive damages. *Radomile v. Pinnacle Treatment Ctrs., KY-I LLC*, No. 23-cv-343, 2024 WL 3033579, at *3 (E.D. Ky. June 17, 2024); *see also Williams v. Wilson*, 972 S.W.2d 260, 264–65 (Ky. 1998). Kentucky law instructs jurors awarding punitive damages to consider the defendant's knowledge of the likelihood that harm would result from their misconduct, the profitability of the misconduct, whether the defendant concealed the misconduct, and whether the defendant took actions to remedy the misconduct. Ky. Rev. Stat. § 411.186(2). Considering the totality of MEC's conduct, these factors are met here. Rather than remedying the fraudulent inducement that it initially concealed, MEC doubled down and attempted to extract unearned profit even though it knew its demand would "hurt" Bonfiglioli. Trial Tr. I, R. 107, PageID 1773.

Caselaw also supports the award. Courts applying Kentucky law have affirmed a wide range of punitive damages awards for fraud. *See, e.g.*, *Yung*, 563 S.W.3d at 73 ($80,000,000); *PBI Bank, Inc. v. Signature Point Condos. LLC*, 535 S.W.3d 700, 708, 728 (Ky. Ct. App. 2016) ($5,500,000); *Fastenal*, 609 F. Supp. 2d at 670–71 ($100,000). As *PBI Bank* explains, "it has long been the law in [Kentucky] that fraudulent conduct is an appropriate basis for the award of punitive damages." 535 S.W.3d at 728. Kentucky courts have also long recognized that plaintiffs may recover punitive damages even when the jury awards only nominal damages. *Fastenal*, 609 F. Supp. 2d at 658 (citing *Louisville & Nash. R.R. Co. v. Ritchel*, 147 S.W. 411, 414 (Ky. 1912)). Thus, caselaw and statutory law gave MEC fair notice that Kentucky law could award significant punitive damages for fraud of this kind.[2]

In light of the governing guideposts, we conclude that the award of $280,000 in punitive damages is constitutional.

## CONCLUSION

We affirm in full.

---

[2]Under this guidepost, courts have also examined statutory civil penalties for similar misconduct. *E.g.*, *Gore*, 517 U.S. at 584. The parties have not cited (and we have not found) any comparable civil penalties under Kentucky law, so we do not address that comparison. *Cf. Romanski*, 428 F.3d at 649 (assuming a lack of comparable civil penalties "in light of the parties' silence on the question"); *PBI Bank*, 535 S.W.3d at 728 (similar).